Case number 24-5105, Institutional Shareholder Services, Inc. v. Securities and Exchange Commission and Gary Gensler in his official capacity as Chair of the Securities and Exchange Commission, National Association of Manufacturers, Appellants. Mr. Hughes for the Appellants, Mr. Harris for the Appellate. All right, Mr. Hughes, good morning. Good morning. May it please the Paul Hughes for Appellant, National Association of Manufacturers. Proxy advisory firms play a huge role in the public markets. Within 48 hours of a single firm disclosing its voting recommendations, as many as 45 percent of a company's shareholders will vote in lockstep. But these firms often have conflicts of interest, their reports are good corporate governance. When it promulgated modest protections in 2020 for public companies and their investors, the SEC acted within the scope of its statutory authority. The District Court's contrary conclusion rests on its view that to solicit an entity must have some self-interest in the result it urges, and it found that proxy firms lack such a self-interest. That conclusion is wrong for three principal reasons. First, the District Court failed to appreciate the Exchange Act's express delegation of definitional authority. The Commission was well within the bounds of Section 14A's scope to conclude it may regulate those who urge or advocate a particular result regardless of any self-interest. Second, the District Court's result is completely atextual. The District Court and ISS prefer definitions of solicit like excite to action or entreat to do something, but those definitions don't contain a self-interest requirement. The District Court engrafted a self-interest requirement through looking to a case citation in Black's Law Dictionary, which I'll discuss is just not a proper way of using that dictionary. Third, even if solicitation, contrary to my first two arguments, requires some self-interest on behalf of the proxy firm, the FCC found record evidence that such self-interest is present here. Proxy firms make their money because their customers follow their recommendations. Proxy firms make recommendations explicitly to obtain changes in corporate practices, and as the FCC found, proxy firms, because of conflicts of interest, can have immediate self-interest in the advice that they provide. Can I ask you a threshold question about standing? What is the injury to NAM members here? Thank you, Your Honor. It seems a bit unclear. Thank you. So in the District Court, there was a declaration of Chris Netram who showed that many are directly affected by the advice that the ISS provides. And the ways that they are affected, for example, as his declaration describes, is when there's inaccurate advice, it can be very difficult and time-consuming for those members to be able to try to make corrections that ISS or Glass-Lewis's members receive in a timely fashion. So they have to go to great expense in order to try to show their stockholders the errors that are in the ISS report. Is that kind of an informational harm? It's a pocketbook harm, Your Honor. There is a direct pocketbook harm because what companies have to do in order to be able to overcome the information is, for their own expense, distribute countervailing information. What the underlying 2020 rule does that is ultimately at issue here is it requires proxy advisory firms to be able to provide to their clients a link such that if a registrant puts up on EDGAR a response to the ISS proxy analysis, a link to that response is provided to ISS customers through the ISS system. If that doesn't happen, the registrants have a significant out-of-pocketbook expense of getting that same information to their shareholders, and it's also not usually done in nearly as timely a fashion. Additionally, to obtain even the report, the actual proxy analysis report, can be highly time-consuming and expensive if the companies can get it at all. I think very indirect harms. I think they're kind of direct and immediate harms, Your Honor. I'll say the National Association of Manufacturers, when this rule was rescinded, filed suit and had that rule struck directly because they had standing. There was never a challenge to the standing in the litigation that came through the Fifth Circuit. It's often not a challenge to standing. Well, I appreciate that, Your Honor, but I think that's because it's clear that the members, associational standing case, the members have this immediate direct pocketbook injury of how do they get this information timely to their shareholders? Second, how do they even get access to the reports? Because these reports are often proprietary information. But again, step back for a second. You have a report that makes critical statements about company management and suggests voting against the company management. Well, oftentimes those reports may be deemed confidential, so the registrant, the company who those reports are about, may not have ready access or timely access to be able to even receive those reports. That's a direct injury on the company, on the registrant, not to have immediate access to that information. And again, as I just said, 45% of stockholders may vote within 48 hours. There's evidence that 30% can vote within 24 hours. Time is absolutely of the essence in one of these proxy fights. One of the requirements of the 2020... Don't the companies only get the information if the proxy advisor works within the exemption? Well, Your Honor, in order to be entitled to the exemption, the proxy advisor has to provide the information to the... The proxy advisor may choose not to provide that information because may choose not to fall within the exemption. Your Honor, I think as a... So that makes the harm to the companies even less direct. Well, I think, Your Honor, as a practical matter, the company or the proxy advisory firms deeply want exemptions from all of the other requirements. So they do and they would... So as a practical matter, they make this information available. So they... And that's the design. The 2020 rule, I think, is shot through with the notion that this is in order to enable registrants to get timely access to this information. And again, it has to be provided to the registrant at the same time that it's provided to stockholders. As I said, if 30% are voting within 24 hours and 45% are voting within 48 hours, a difference of getting it immediately the same time the stockholder gets it versus getting it two days later can be 45% of the stockholders of a corporate election having voted. And so the immediacy of the information that the registrants get by proxy firms that adhere to the 2B9 exemption provisions gives a very immediate impact in addition to, as I said, the cost of distributing information. I don't want to take away your time to get to the merits. So thank you. Thank you. So... Yes, you're right. Sort of maybe jump to at least how your textual interpretation works.  Is it effectively that anything that impacts, affects, influences a proxy vote can be regarded as a solicitation? I think to start with, what our view of what solicitation is, is the SEC's construction of it from 1956 on. And this is just from the... And my issue is I'm having trouble understanding what exactly they thought it meant. And when they say words like move to action or urge, but it seems to come down to anything that impacts, affects, influences a proxy vote. And if that's oversimplifying, I want to hear why. Well, I think that the distillation of this is the regulatory text, which is the reasonably calculated to result in. I think that is somebody who is making a statement with the intent to influence that vote. So I'm not sure that's materially different or distinct from what your honor just said. So I think we may have a point of agreement there. I just think what the SEC has said from 1956 current, as to how they've interpreted it by regulation, is correct. Now, there are different textual definitions that have been provided. To urge is one that was discussed below. My friends have a series of other terms that they prefer, but I think ultimately they all get to the same point, which is you're suggesting somebody to do something. You're urging them to do a particular thing. You are entreating to action. You are inciting to action. These are the different sorts of terms that are all thrown around as definitions for solicit. It's a very strange understanding of the word solicit. I think both from 1934 and today. I mean, because here, institutional investors hire, you know, ISS and I guess the one other company, you know, for this advice. They want this advice. And so it just doesn't sort of fit within the ordinary understanding of solicit. Well, I don't think that's entirely... Is it the marketing? I mean, do we really have to rely on the marketing? The fact that they market their services, that's a solicitation? I think the marketing does get us there. I don't want to shy away from that argument, but I don't think that is our principal argument or the court has to rest on that argument because what they are doing in the actual analysis, and I think it might be helpful just to show an example. In the appendix at page 457, there is an example of what one of these ISS reports directly looks like, and it's called an ISS Proxy Analysis Benchmark Policy Voting Recommendations. This is one that's in the record for Braemar Hotels, and it has the seven issues that are up for the corporate election, and it says what the board's recommendation is, and then it provides the ISS recommendation. And for five of them, it's different than the management, the board recommendation. I understand. I mean, NAM makes a lot of arguments about why ISS's advice is bad or ideological or whatever it is, and there are a number of reasons why corporations don't like this, but I'm not sure how if institutional investors enter into a normal commercial relationship, they pay money to ISS for this advice. How does the advice become a solicitation for proxy vote? Like, just in, like, ordinary English. I just don't see that. It's hard for me to see that. I mean, their preferred definition includes, for example, entreat to do something. What ISS is doing at page 457 is entreating the folks who are purchasing its analysis to do a particular thing. It's not even entreating. Someone has paid them for their advice. They could take it, they could leave it, but they've asked for the advice. They paid for the advice. So how is the advice then an entreaty? Well, it is a commercial transaction. You're right. I think, like, let me provide a different example. If I go see my doctor who I pay for, my doctor will likely solicit me to lose weight. That is a term that is used. He gives you advice to lose weight. Of course, yes. And I don't think there is a distinction there because what they're doing is urging. They're saying, awake to action, entreat to do this particular thing. That is well within the meaning of what solicit encompasses. And again, we're comfortable with their definitions of it. It is urging somebody to do a particular thing, to awake to action. It is saying, here's the action you should take. Awake to action comes from Blackslaw Dictionary, one of the dictionaries that ISS and the district court rely upon. But if you ask someone for something, or advice or recommendation, how is that advice and recommendation a solicitation? Because what they're doing in this particular instance and every time they send one of these reports is they're trying to awake you to action of saying, here's the proxy vote. Don't be silent. Here are the actions you should take. You should take these particular actions. You should vote for or against these proposals. You should because you've asked for our advice. You've paid for our advice. And we are giving you this advice. And you are being awoken to action to do this thing that ISS thinks is in your interest, and ISS thinks is in the world's interest, and in the global interest. And ISS thinks it's its own interest because it's selling advice. It needs people to follow its advice in order to have a market for people to continue buying its advice. It only exists if the consumers of this advice actually follow it and find value to it. What the advice is designed to do is to have- Because of the solicitation, that's because of a market relationship that no one's going to pay for advice that they find not useful. People pay for the advice because for whatever reason they find it useful. Maybe they shouldn't. For whatever reason, NAM thinks, follow this advice. But I don't know how the advice becomes solicitation. Again, I think it comes back to the underlying definition that we can agree to is insight to action. Is this inciting the recipient of this advice to take some action? It is. It is inciting saying, you need to do a particular thing. What is the thing you need to do? You need to vote for this. Vote against that. That is inciting to action. It's saying, here's the action you take. Beyond even inciting to action, ISS in the robo-voting platform will, for many of their customers, automatically vote unless it gets overridden by the customer. In other circumstances, it creates- a matrix where an investor can just click through and vote their ISS recommendations, all of them, at the touch of a single button using an ISS platform. And they choose to do so. Yes. But the materials that are being sent are saying, here is the action you should take. We're recommending you're doing it. That is soliciting them taking that action. We recommend this to you because you've paid for our recommendation. Well, yeah. You've paid for the recommendation. That's, of course, the reason they're paying for it. You said earlier, it's been marketed to them. But beyond being marketed to them, ISS needs to have people to take this advice for them to have a business. They are in the business of selling this advice and people wanting it and finding it actionable. And what's more, the SEC at J819, footnote 141, says that they're providing this advice in part because the firm's, quote unquote, such influence is good. And ultimately, they want to have a positive influence on their clients because they view that as part of their responsibility to promote good governance. So there is additionally a motivation that is embedded within this advice. It's promoting a sense of what the proxy firm views as good governance. That is also part of the solicitation that the SEC found demonstrating why this was within scope. And step back again for a moment. From a statutory perspective, the question here is not who has the very best understanding of solicit. The question is, is what the SEC did within the scope of what solicit the broad meanings can be? And for example, the district court looked to the Oxford English Dictionary at page 20 of the district court's decision and found that to urge is one of the included definitions. Then later at page 23, the district court found that the Oxford English Dictionary is one of the better definitions. The SEC pointed to, again, page 819 urge as one of the definitions on which it was resting as a permissible construction of this term. And given- Let me interrupt you because I have the same concern Judge Rao does. If I come to you for legal advice, have you solicited it? Well, Your Honor, I think if I am telling you, you need to do a particular thing at a particular time. And it's in the backdrop of I have a business where I am saying I am providing advice about this particular topic. I'm providing advice about environmental issues. And I am the best at providing advice about environmental issues. I provide this for 5,000 clients. They all rest on me providing this kind of advice. Haven't I solicited your advice? Solicitation can go both ways. You've solicited my advice. But when I'm telling you that you need to do a particular thing at a particular time, I am inciting you to take action. I'm urging you to do a particular thing in a particular way. That is well within the definition of what solicitation can mean. And again, the SEC has authority to be able to define this term that's been directly delegated to it by Congress. We'll give you a couple minutes to reply. Mr. Harris? Good morning. May it please the court. No one would call a communication a solicitation when the recipient has invited and paid for it. ISS does not go around telling strangers how to vote. It gives its advice only to those who have retained and paid it for this purpose. Investors do not pay ISS to solicit them. I'd refer the court to the Council of Institutional Investors' amicus brief, which helpfully talks about how we  investors engage ISS and makes the exact same point the court made, which is that the investors ask ISS to provide them these services, pay ISS, and then ISS provides the advice. And ISS critically only analyzes securities or votes that the clients ask it to. Moreover, ISS is a fiduciary, which means that's the antithesis of a solicitor. A fiduciary is required by law to work solely in its client's best interest, not its own. And so again, I just don't think anyone familiar with English would say ISS solicits its client's votes when it says, here's how we recommend you vote based on the criteria you told us. Now, I'd like to go to Judge Garcia's point. My friends, I think, in terms of the statute, if the court agrees with this definition, we've essentially turned the statute into the SEC may regulate votes in the public interest. And let me give you a comparison. 10b, the most famous provision of the securities law, same statute, it says the SEC may regulate manipulative or deceptive practices in connection with the purchase or sale of securities. They could have done the exact same thing. They could have said the SEC may regulate manipulative, deceptive, unfair practices in connection with shareholder votes. They didn't. They said the word solicit. And I do think if we allow the SEC via NAM to define solicitation based on one rare definition, again, I think that essentially writes solicit out of the statute. It has to do some work. Now, even Loeb or Bright, at all times, the agency's interpretation always has to be reasonable. And it's difficult to describe how much NAM's position warps the purpose of the solicitation rule. So the purpose of the solicitation statute was to protect ISS's clients from NAM's members. It was the corporations, the partisans, the corporations, management, and opponents running around soliciting based on false premises. But to use that for NAM to regulate ISS, it just completely inverts the statute to say, we're going to use this to regulate the investors' advisors. Because of course, at the end of the day, when there is this partisan fight over a takeover or a board election, ISS helps its clients sort those issues out and figure out how to vote. So again, just to interpose Section 14 in there makes no sense. And I think it's important to note, too, on a practical level, we put several of them in the appendix. ISS's clients are some of the richest and most sophisticated entities in the financial system. They didn't want this rule. So the people who are actually paying ISS for advice, they said, we manage conflicts. ISS, as an investment advisor, has to maintain a comprehensive program to manage its conflicts. The investors weren't raising these issues or this notion of errors and inaccuracies. That's not coming from our clients, who seem pretty happy with our work. It's coming from the publicly traded companies. And they have a difference of opinion with ISS on some things like director qualifications, executive comm, sustainability. But even on those things, I mean, ISS has clients that vote for sustainability measures and those that vote against it. We have red states. You mentioned Loper Bright. And NAM, obviously, has placed a lot of weight on this provision saying the SEC has power to define technical and other terms. Can you sort of directly explain whether and how you think that should affect how we approach the statutory analysis? Sure. I mean, I agree it's there. I mean, Judge Mehta acknowledged that. I mean, after, because of course, to figure out, there's no question, I think, even for my friends, that the court has a role in policing the bounds of what that means. The word solicit has to mean something. Judge Mehta acknowledged this. He acknowledged the commission's rulemaking and definitional authority. And so I just, I think it strains both Loper and the statute beyond the breaking point. If, again, a party standing in the shoes of the SEC could win based on a rare definition. I think a great case on this, I think two great cases on this are MCI and then Regions Bank. So in Regions Bank, it was the 11th Circuit. It's a really interesting case about does the applicant, does the word applicant for credit, does that include a guarantor or is it just the applicant, the person applying? And the majority by Judge Bill Pryor surveyed lots of dictionaries and said, well, it would really, really push the bounds of usage to say the guarantor is the applicant. The dissent disagreed and said, no, we think you can't limit it to this use of applicant just because it's more common. Same thing, and MCI was the exact same thing of the meaning of the word modify and based on an extensive interpretation of that term, even though the agency there was getting Chevron deference, just like in Regions Bank, the court via Justice Scalia said, you just can't take modify to mean essentially upend. You would say this has some effect, whatever effect it has, it would give the SEC some leeway to stretch the bounds of what solicit means, but whatever the bounds of that discretion, they've gone beyond it here. Yes, and again, even the SEC, I don't think has ever disputed that its preferred definitions were rare. And as I think the conversation with my friend and ourselves, I just don't think anyone would use language this way. I mean, and this is Commissioner Lee's dissent, JA 804 to 05, merely providing a service in response to a request from a client is not solicitation. It's just not how people talk. And I think there is something different. The commission recognized this once, in some of its early opinions, they recognize this difference for financial advisors and others between, are you sending it to people who didn't ask for it? Or are you just advising your client? And then mysteriously that disappeared when the commission tried to pull in proxy advisors into this regime, and they stopped talking about whether it was unsolicited. Mr. Harris, what about the marketing, right? The marketing of expert services? I mean, that seems the closest thing perhaps to solicitation. I think there's two issues with that. The first is- Especially if ISS has its own ideological perspective on what corporations should do, and then they market themselves as experts in proxy advice. Right, and I think there are two problems with that. The first is, even in that context, the advice, the quote unquote influence, the urging, all that doesn't start until after you're retained. So sure, ISS, like any professional says, we do a good job, we'd like you to hire us, but they're not sending the advice until then. The second problem with that theory, that's not what the commission regulated here. The commission wasn't saying, ISS, when you market your services, you need to do X, Y, and Z. They're regulating the advice. So even if that theory works, and we don't think it does, there's still this mismatch between that and what the commission ultimately regulated. So I know you dispute this premise, and I'm not saying I accept it, but imagine the SEC actually had found, affirmatively, that proxy advice firms have an interest in the outcome of shareholder votes, and they give their advice to further their own self-interest. Would you agree, if that were the case, that ISS would be soliciting, even under your understanding, or would there still be some distinction? I think there'd be a big problem with that, because as a fiduciary, ISS is obligated to put its clients' interests above its own. So that finding would essentially mean ISS was breaching its fiduciary duties. And if ISS does that, it's a registered investment advisor. The commission has many, many tools to fix that. I mean, ISS gets audited by the SEC. It has to do compliance reports to say nothing of its clients, who, again, are some of the biggest entities in the financial system. So I think... My understanding is that at least some of the advisory firms believe they've fallen within an exemption to the Advisor Act. And so I think, is the answer yes? I understand if you think that would be a bunch of problems with that factual finding. I'm just trying to figure out what the bounds of what it means to solicit are. If they were self-interested and giving advice motivated to reach a particular outcome, would that... It seems like that would qualify as solicitation, right? Right. And I obviously dispute the premise. But yes, the nature of solicitation... Or let me take the example of the broker-dealers. In the 60s, broker-dealers, who are very well positioned in these markets, many of them were on the payroll of the partisans, of the boards or the insurgents. And so the commission says in 64, if the broker-dealer is working on behalf of someone actually soliciting, sure, you're covered. So I think in that scenario... And let me talk about what you said about some advisors not being regulated. So first of all, ISS is the only party here and there's no dispute. We are regulated. But it would be really odd to say... And first of all, if you're acting as an investment advisor, you're subject to the duties and the conflict requirements regardless. But it'd be really odd to say, some proxy advisors aren't investment advisors. Therefore, we're going to pull all of them into this regime that doesn't fit. And to go back to Judge Rao's question about the exemption, it is difficult to describe how absurd it would be for ISS not to be exempt. So ISS has hundreds of thousands of clients across thousands of votes, many with custom policies. And the crux of the non-exempt solicitors is you have to file. You have to basically file with the commission what you've been soliciting. I think ISS would have to make hundreds of thousands of filings. And so no one ever thought they were going to do that. So we had to create all these exemptions. And so instead of just recognizing ISS doesn't solicit, we're regulated under the Advisors Act, you have to pull them into this regime that doesn't fit textually and then make up exemptions to pull us out of it. It seems easier to just say, we're an investment advisor. If we have problems with that, there are plenty of tools to address it. Could they impose those disclosure requirements through its other regular... Could the SEC impose those disclosure requirements through its other regulatory authorities? Rather than through this exemption mechanism? The Advisors Act. So one of the pieces of this solicitation rule is about conflict disclosures. One of the core aspects of being a registered investment advisor is conflict disclosures. ISS has to, to the commission's satisfaction, develop procedures to disclose, manage, and mitigate any conflicts. And so again, it's not only... It's duplicative. But again, I think the point of this is the commission is trying to get ISS under the thumb of issuers, but that just doesn't make sense. It doesn't comport with the statute. And again, the commission had to do a lot of gymnastics, both to pull us in as a solicitor. And then once a solicitor to then say, well, but you don't actually have to follow the stuff solicitors do, because that makes no sense. So again, unless there are further questions, again, I would just conclude by saying... I'm sorry, I have one question just about... If you could just say... I think a number of NAM's arguments focus on the fact that ISS is a duopoly. And I'm just wondering if you can explain to me why this market is a duopoly. Or if you have any thoughts about why this market is a duopoly. I know it's not. I'm just interested in understanding how this market works. Well, I think I would dispute duopoly. I mean, there are certainly others. And I believe Vivek Ramaswamy has established a proxy advisor that is intended to have a different viewpoint than some of the others. So I would dispute it's a duopoly. But I think companies hire ISS because it provides valuable services and does a good job. And it's important to note too, nobody has to hire ISS. If an institutional investor wants to do it, they can hire more staff. They can do this in-house. And so the fact that they hire ISS, notwithstanding these allegations of conflicts and inaccuracies, I think shows that our clients at least think ISS is doing a good job. And again, the last thing I would say is it's just a truly odd rulemaking when our clients, the people we contract with, overwhelmingly didn't want these rules. And I think Commissioner Lee wrote very eloquent dissents in both things we challenged on this point. You mentioned that, am I right that the way ISS would behave if this rule were in effect would be to do what it needs to do to be under the exemption rather than the alternative? We'd have no choice. I mean, I think it would be, I mean, it would be almost unthinkable the amount of filings they would have to make if every custom policy that we make for a client for every vote is deemed a solicitation. I think it would be unthinkable to not be exempt. This isn't biting on us, but do you have a view on NAM's standing? Because if that's the case, and it seems like you would be providing these disclosures and providing your currently confidential advice, that would reduce some burdens on them, make them more effective at countering, responding to the advice. You can read, so we opposed intervention below on grounds of standing. I believe they were given permissive intervention. We didn't appeal that, but I think our brief opposing their intervention below sets forth our view of that. Again, we didn't challenge it here, but we do have a whole brief on why we didn't think they had standing. It does seem, though, that your view of how the exemption works suggests they have a quite direct interest. We didn't challenge their standing in this court. Let me ask you, do you have any view on why the SEC does not vote for NAM? I mean, they didn't take the resources to appeal. And remember, there's been this extraordinarily convoluted history of the rule. So after we initially sued to challenge the exemption conditions, the commission rescinded the exemption conditions, but not the definition, then the SEC lost on the definition. But since then, the Fifth Circuit has reinstated some of the exemption conditions. So I think it's possible they just took a view of it's up to, they just want the courts at this point to resolve this once and for all. But honestly, I think the fact that they're not here, I think should have the court take with a grain of salt any arguments from my friends about damage to the regulatory regime or problems with enforcement. Thank you. Thank you. Mr. Hughes, why don't you take two minutes? Thank you, Your Honor. I'll try to make four brief points. The first, again, the delegation point is an important one. In Lindeen v. SEC, this court explained that those provisions have real effects and will take you outside the ordinary meeting and give flexibility to the agency. Second, their preferred definition, a wake to action, fits precisely what is happening here. And let me give six things that happened. They market their services, telling investors why they need to purchase them. They make money by having investors follow that advice. They issue comprehensive reports that they call benchmark policy voting recommendations. Those reports are transmitted immediately around the vote when they're going to have their maximum impact. Five, they offer a platform for the voting, give click-through voting, if not robo-voting. And six, it has an enormous pragmatic effect. Even the district court, and I think when you look at ISS's brief, they don't say they don't awake somebody to action. Their argument is actually far more nuanced. They say the reason it is for solicitation that we're not soliciting is it's not in our own self-interest. So they're taking actually a more narrow understanding of solicitation because this fits comfortably, but that self-interest provision is ataxial, doesn't have a basis. To Judge Garcia's question about if there were conflicts of interest, would that show a basis? And the SEC at joint appendix 819 footnote 141, this was sort of a tertiary reason defending its permissibility, but it did tie in its conflict of interest analysis. And then it cross-sited to the other provisions of the rule where it found the conflicts of interest and the importance there. And that's part of the basis on which the SEC said there is solicitation here because of the conflicts. That's squarely within the reasoning the SEC gave. Last point to Judge Henderson's question about why the SEC is not here. This was the product of decades long, over a decade long rulemaking across administrations. This was a bipartisan effort up until Commissioner Gensler decided that he was going to try to pull the plug on it at all costs. First, the commission in 2021 suspended the operation of the regulation wholesale until a court said that you can't simply say a regulation is no longer enforced. Then there was a kind of very quick of the night rescission that was struck down by the court. The last action then was dismissing the appeal the SEC took to take the SEC jurisdictionally out of the game in this case. And that's why I think the SEC is not here. Thank you. Thank you.
judges: Henderson; Rao; Garcia